# UNITED STATES DISTRICT COURT

# FOR THE DISTRICTCT OF MASSACHUSETTS

---

**Nancy Shay,**

*Plaintiff*,

 **Civil Action No. 11 – 10932 - GAO**

**v.**

 **Honorable George A. O'Toole, Jr.**

**Barbara Walters,**

*Defendant*.

---

## MEMORANDUM OF LAW OPPOSING DEFENDANT'S

## MOTION FOR JUDGMENT ON THE PLEADINGS

Mark Ellis O'Brien
17D Fernwood Drive
Leominster, Massachusetts 01453
Telephone: 978.413.6757.
FAX: 978.728.4991.
justice457@gmail.com

*Attorney for Plaintiff Nancy Shay*

21 July 2011

# TABLE OF CONTENTS

PRELIMINARY STATEMENT………………………………….…………………….....…….…….4,5,6

ALLEGATIONS AND BACKGROUND…………………………………………………..……………6

ARGUMENT………………………………………………………………..…………………..8

I.      Plaintiff's 28-Year-old Tortious Interference Claim Is Not Time-Barred; Will Prevail on the Merits, and Supports the Exercise of Personal Jurisdiction……………………………………………………………....…10

II.      Plaintiff's Defamation Claim Survives as a Matter of Law………………………………………………………….……14

    A.  Audition's First-Name References Need Not Identify Plaintiff to a, "Considerable Segment in the Community."………………………………………………15

    B.  The Challenged Statements Do Discredit Plaintiff's Reputation…………………………………………………………….14

    C.  Truth or Substantial Truth Does Not Bar a Libel Claim in Massachusetts……………………………………………………15

    D.  Plaintiff's Complaint Does Plead that the Challenged Statements Were Published with the Requisite Fault; and Plaintiff has Alleged Supporting Facts………..…16

III.      Plaintiff's Emotional Distress Claim is not Duplicative……………………………17

    A.  Plaintiff's Defamation Claim does not Fail. Similarly, Plaintiff's Emotional Distress Claim will Survive…………………………………………………..…14

    B.  Plaintiff has Pled a Claim for Negligent Infliction of Emotional Distress…….……18

    CONCLUSION……………………………………………………...……19

# TABLE OF AUTHORITIES

**Cases**

*Albright v. Morton*, 321 F. Supp. 2d 130  (D. Mass. 2004)……………………..…..…17

*Amrak Prods., Inc v. Morton,* 410 F. 3d 69 (1st Cir. 2005)……………………………..14

*Ashcroft v. Iqbal*, 129 S. Ct 1937, 149 (2009)………………………………………….8

*Bell Atl. Corp. v. Twombly*, 550 U.S 544 (2007)…………………………...…..…………8

*Bowen v. Eli Lilly & Co*., 408 Mass. 204, 557 N.E.2d 739 (1990)……………..……10,11

*Cabello v. Fernande Larios*, 205 F. Supp. 2d 1325  (S.D. Fla. 2002)……………...……10

*Gertz v. Robert Welch, Inc.,* 418 US. 323 (1974)……………………………..…………16

*Hanson v. Denkla*, 357 U.S. 235 (1958)…………………………………...…….…..……12

*Myers v. Boston Magazine Co*., 403 N.E.2d 376 (Mass. 1980)……………..…..……14,16

*Noonan v. Staples, Inc.*, 556 F.3d 20 (1st Cir. 2009)……………………………………15

*Payton v. Abbott Labs*, 437 N.E. 2d 171 (Mass.1982)……………..……………..……18

*Perez-Acevedo v. Rivero-Cubano*, 520 F. 3d 26 (1st Circuit 2008)……...…………..……7

*SEC v. Tambone*, 597 F.3d 436 (1st Cir. 2010)……………………………...……………8

*Smith v. Suburban Restaurants, Inc*., 374 Mass. 528 (1978)……………….…………14

**Statutes**

Massachusetts General Laws Chapter 231 Section 92……………………..………15

Massachusetts General Laws Chapter 260 Section 2A………………………..………10

Massachusetts General Laws Chapter 223A Section 3. ……………………….…..…13

**Other Authorities**

Society of Professional Journalists, *Code of Ethics*  http://www.spj.org/ethicscode.asp...17

*Tender is the Night*, F. Scott Fitzgerald (1934)………………………………….…..……4

**Rules**

Rule 12(c) of the Federal Rules of Civil Procedure……………………………….…..6,7

Rule 8(a)(2) of the Federal Rules of Civil Procedure…………………………….……..….……8

Rule 15A(2) of the Federal Rules of Civil Procedure………………………….…..…………...9

*Plaintiff Nancy Shay respectfully submits this Memorandum of Law in opposition to Defendant's Motion for Judgment on The Pleadings.*

## <u>PRELIMINARY STATEMENT</u>

This lawsuit, although it arises from events that occurred nearly thirty years ago, does not violate the the First Amendment rights of one of this country's most celebrated newswomen, as the Defendant contends

There is nothing in the First Amendment granting leave to a newswoman—celebrated or not—to publish defamatory statements with reckless indifference to the truthfulness thereof, and in callous disregard of the foreseeable suffering those words would cause.

By some standards, thirty years is a long time. However, justice demands that any attendant statute of limitations be tolled because the Plaintiff was intimidated into silence. For years, that silence deprived the Plaintiff of redress.

The loss of a *Wyckham Rise* education—the opportunity of a lifetime for a poor foster child from Boston—festered like an open wound, as the Plaintiff lost her way and lived a hopeless life of depression, suicide attempts, and alcoholism. Legal memoranda are usually built exclusively on case law, statute, and legal reasoning. However, the words of F. Scott Fitzgerald aptly frame the backdrop of this case and explain why after so many years, the Plaintiff seeks to right the wrongs that befell her.

*"One writes of scars healed, a loose parallel to the pathology of the skin, but there is no such thing in the life of an individual. There are open wounds, shrunk sometimes to the size of a pin-prick but wounds still. The marks of suffering are more comparable to the loss of a finger, or the sight of an eye. We may not miss them, either, for one minute in a year, but if we should there is nothing to be done about it."* Tender is the Night, (Page 144).

It is more likely than not that Defendant Barbara Walters used her influence and power to have Plaintiff Nancy Shay expelled from the *Wykeham Rise School*, when the Plaintiff was about 16 years of age. This interference was motivated by Defendant's desire to end a relationship the Plaintiff was having with Jackie Guber, Walters' adopted daughter. In addition to the tortuous interference with the contract Nancy Shay had with *Wykeham Rise*, the Defendant told Nancy Shay to forever hold her tongue. "Don't say anything about this to anybody. You'll ruin your name. Never mind, you'll ruin my name and my daughter's name."

For years the injury haunted Nancy Shay quietly until it was brought up anew and glaringly with the publication in 2008 of *Audition*, Barbara Walters' memoir. There, the journalist wrote a fanciful tale of those days at *Wykeham Rise*—that Nancy Shay had been kicked out for bad behavior in the context of an imaginary episode involving the Defendant's step daughter Jackie Guber, Nancy Shay and drugs in a nearby town.

If Ms. Walters had told the whole truth in her book, Nancy Shay might have been spared her emotional suffering. In the very least—if the truth had been something Ms. Walters wished not to address—then it would have been better for Nancy Shay if nothing at all had been written about her.

## ALLEGATIONS AND BACKGROUND

The following facts issue from the Plaintiff's complaint, and Plaintiff respectfully asks that they be presumed as true for purposes of the 12(c) Motion filed by the Defendant:

Plaintiff and Jackie Guber, Barbara Walters' stepdaughter, were students at *Wykeham Rise School* in Washington, Connecticut around 1983.

Contrary to Defendant's version in *Allegations and Background*, Plaintiff *does* allege the involvement of Defendant in the expulsion of Nancy Shay from *Wykeham Rise*. "In Audition, Defendant admits to a strong motive to separate Ms. Shay and Jackie Guber. 'I told the school that Jackie was never to be allowed to visit [Plaintiff] again…' Apparently, the need to, '[take] Jackie out of school,' ended with the Plaintiff's expulsion…"  Paragraph 16 of Complaint.

6

Defendant's involvement in Nancy Shay's expulsion is brought up again in *Count I* of Plaintiff's Complaint: "21. Defendant induced a party to the relationship to breach the relationship." Here, the relationship is the contractual relationship that student Nancy Shay had with *Wykeham Rise*.

Defendant writes in *Audition*, "She [Nancy] and Jackie had been found in a nearby town high on God-knows-what." In Paragraph 12, Plaintiff takes exception to that statement. "That incident never occurred."

In the context of that paragraph in *Audition*, it becomes clear to any reasonable reader that the bad behavior of Nancy is inextricably tied to the incident in a nearby town, although the incident is fiction. Plaintiff alleges that the bad behavior alluded to was actually her romantic relationship with Jackie Guber and the time Headmaster Hugh Silk walked in on the two young girls. "The behavior in question had nothing to do with the imaginary incident in a nearby town. Rather, it refers to the incident in Ms. Shay's dormitory room involving Ms. Shay and Jackie Guber." Paragraph 16 of Complaint.

Lesbian conduct was not, "bad behavior," at *Wykeham Rise*. It was common and was sanctioned by students and faculty, although perhaps not recognized by any written policy. What the record reflects in this regard will issue during discovery.

The Plaintiff further alleges that she was intimidated into silence by the Defendant during a telephone conversation at a bus station before she and Jackie Guber left Washington, Connecticut to spend the duration of Jackie's three-day suspension from *Wykeham Rise* with a friend. "Don't say anything about this to anybody. You'll ruin your name. Never mind, you'll ruin my name and my daughter's name." Paragraph 7 of Complaint.

7

In short, the Plaintiff alleges that Defendant tortuously interfered in her affairs because Plaintiff was having a lesbian relationship with Defendant's stepdaughter, and that Defendant took exception to this state of affairs.  In the interim, the Defendant told the Plaintiff to be quiet about the whole thing. Later, to the detriment of Plaintiff's reputation, Defendant told a fanciful and false version of what had happened at *Wykeham Rise*, purposefully omitting the truth about the incident in Ms. Shay's dormitory room

## ARGUMENT

Under a Rule 12(c) Motion seeking dismissal for failure to state a claim, the Court weighs the Plaintiff's complaint for plausibility.  *Perez-Acevedo v. Rivero-Cubano*, 520 F. 3d 26, 29 (1st Circuit 2008) (noting that Rule 12(c) standard is same as Rule 12(b)(6) standard). Dismissal is warranted only if the complaint does *not*, "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct 1937, 149 (2009).

A complaint must include more than, "a formulaic recitation of the elements of a cause of action," *Bell Atl. Corp. v. Twombly*, 550 U.S 544, 555 (2007); it must include, "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Iqbal*, 129 S. Ct. 1949. "If the factual allegations in the complaint are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture, the complaint is open to dismissal." *SEC v. Tambone*, 597 F.3d 436, 442 (1st Cir. 2010) (in banc) (citing Twombly, 550 U.S. at 555).

The Court assumes the truth of factual allegations that are, "well-pleaded," but understandably does not accept as true any, "legal conclusion couched as a factual allegation."

*Iqbal*, at 1949-50. Accordingly, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." Id at 1950. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." This isn't taken to mean that a trial should take place in the confines of a pleading.

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain only a "short and plain statement of the claim showing that the pleader is entitled to relief." "[D]etailed factual allegations" are not required. *Twombly* at 555. Rule 8 requires the Plaintiff to show plausible factual allegations, accepted as true, to "state a claim to relief that is plausible on its face." *Id*., at 570. A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*., at 556.

Courts do not hesitate to sustain claims where, as here, they might contain minor curable legal defects. Taking the Plaintiff's factual allegations as true, her claim is plausible on its face.

Plaintiff's complaint concerns events that happened many years ago, and was constructed in haste to meet the three-year statute of limitations, lest the Plaintiff be forever foreclosed from relief. Plaintiff contends that the factual allegations stated are sufficient to carry its burden to state a cause of action for which relief can be granted. Under the doctrine of notice pleading, discovery is expected to compliment the Plaintiff's allegations, and solidify her claim.

Justice requires the Plaintiff to file a Rule 15A(2) Motion to Amend by special leave of the Court. Facts have come to light that were unavailable through due dilligence at the time of filing. That Motion is forthcoming.

**Plaintiff's Tortious Interference Claim is Not Time-Barred. Nor is it Without Merit.**

**The Claim Can Support the Exercise of Personal Jurisdiction.**

Plaintiff was intimidated by the Defendant at the time of the tortuous interference when she was told to remain silent. "Don't say anything about this to anybody. You'll ruin your name. Never mind. You'll ruin my name and my daughter's name." Paragraph 7 of Complaint.

At the time, Barbara Walters was an intimidating, established middle-aged figure—"one of the country's most celebrated newswomen." [Defendant's Preliminary Statement, Page 1.]

Nancy Shay was only sixteen, an impoverished foster child from Boston.  If the then impressionable Nancy Shay had not been intimidated into silence, she likely would have engaged the services of the lawyer Shay had been referred to by one of her teachers, and through due diligence, it would have been discovered that Barbara Walters *had* influenced Headmaster Hugh Silk to expel Nancy Shay. Instead the truth about the interference lay dormant until Nancy Shay read *Audition* in 2010. "The important point is that the statute of limitations starts to run when an event or events have occurred that were reasonably likely to put the plaintiff on notice that someone may have cause h[im] injury." *Bowen v. Eli Lilly & Co., Inc*., 408 Mass. 204, 206, 557 N.E. 2d 739, 741 (1990).

Nancy Shay knew she had been injured, but it was hard to tell who the perpetrator—that someone—actually was. By instructing Nancy Shay to be silent about the episode, Defendant pulled the rug out from whatever cause of action the Plaintiff may have had at the time, and her

avenues of redress would normally have closed after the statute of limitations had run. Massachusetts General Laws Chapter 260 Section 2A.

However, this is a special situation where justice requires the tolling of the statute. "Equitable tolling occurs where the defendant conceals evidence or takes other active steps to prevent plaintiff from suing in time, i.e. the defendant's act estops the accrual of the limitations period altogether." *Cabello v. Fernande Larios*, 205 F. Supp. 2d 1330-31, 130  n.4. (S.D. Fla. 2002).

In reading audition, Nancy Shay learned of the Defendant's propensity to interfere in her step daughter's affairs as they related to Shay. "I told the school that Jackie was never to be allowed to visit [Nancy] again." *Audition* Page 381.

The Plaintiff could not have reasonably discovered the degree of the Defendant's interference until she read *Audition*. In the intervening years, Plaintiff was a lost soul without a high school education, not capable of understanding the causes of action that might have been open to her. Her school records from *Wykeham Rise* were missing. The Defendant wasn't volunteering any information, and Headmaster Hugh Silk had lost his *Wykeham Rise* position amid accusations of embezzlement and grade-rigging. The school closed. The truth faded into obscurity.

"The rule does not suspend the running of the limitations period pending confirmation of the plaintiff's injury or its cause, but simply stops the clock until the occurrence of "an event or events . . . that were reasonably likely to put the plaintiff on notice that *someone* may have caused her injury," *Bowen*, at 207. [Emphasis added.]

The Defendant relates another episode involving Nancy.  Jackie had hitchhiked to be with Nancy in, "a Midwestern state." *Audition* Page 383. Jackie asked for money so that she and Nancy could get back to Boston. Instead, the Defendant sent a man to apprehend Jackie. The man, "arrived at the run-down house in the early morning hours. The door was open, and Jackie barely protested as he carried her off to his waiting car." To the contrary, the Plaintiff will show at trial that the girls called the police to have the intruder arrested, but that the police told them that because Jackie was a minor and her mother had sent the man, Jackie had to go with him. In *Audition*, a pattern emerges where the Defendant uses her influence and power to separate Nancy and Jackie.

In Plaintiff's complaint, it's alleged that, "Defendant induced a party to the relationship to breach that relationship." The exact method by which this was done won't surface until the discovery phase of this action.

Defendant in its memorandum suggests that a contract between Nancy Shay and *Wykeham Rise* never existed. However, a contract arises at least by implication, where a student attends a school. Discovery will likely demonstrate that a written contract does exist, and that the Commonwealth of Massachusetts was a party, thereby strengthening the argument that this Court has jurisdiction over the Defendant. Plaintiff recalls seeing a check from the Massachusetts Department of Social Services made out to *Wykeham Rise* for an amount exceeding six thousand dollars.

### Jurisdiction over the Defendant

The events surrounding this action are heavily connected to Massachusetts.

The Commonwealth of Massachusetts was likely a party to the contract between the school and Nancy Shay. Barbara Walters was a regular special contributor to the ABC show *2020* which aired in thousands of Massachusetts homes during the relevant time period. The Defendant purposefully availed herself of the privilege of having *2020*—a show in which she was a star—aired in the forum State. During relevant times, Ms. Walters earned a large part of her income from *2020*, and Massachusetts advertisers contributed to ABC's income when they sponsored episodes of *2020*, thereby contributing to Ms. Walters' income.

"…it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protection of its laws." *Hanson v. Denkla*, 357 U.S. 235, 253 (1958).

Nancy Shay was at her mother's home in Massachusetts when a call came from Headmaster Hugh Silk—her suspension had been converted into an expulsion. As Nancy Shay took the phone call, with class books and homework nearby, the Headmaster insisted that she was being suspended because she hadn't taken any books home so that she could study during her suspension.

The Plaintiff alleges that her suspension, an act outside Massachusetts effected by the Defendant caused tortuous injury in the State, and that the act supports personal jurisdiction over Barbara Walters because [1] the Defendant, "regularly [did] and solicit[ed] business," in Massachusetts," when *2020* was broadcast and Massachusetts advertising was solicited, and [3] "derive[ed] substantial revenue from goods used or consumed or services rendered." Mass. Gen Laws Chapter 223A Section 3.

ABC derived substantial revenue from its broadcasting services in Massachusetts, and this contributed to the Defendant's substantial income during relevant times.

The Court is authorized to, "exercise personal jurisdiction over a person… as to a cause of action in law or equity arising from the person's [relevant activities]. Id.

The Defendant had made a name for herself as an internationally-famous newswoman with a show in which she was a star, airing weekly in Massachusetts. The Defendant's celebrity status and marketable name made her valuable to *2020* and ABC. She had told Nancy Shay to remain quiet about the incident at *Wykeham Rise*, because if she did not keep quiet, "…you'll ruin my name."

**Plaintiff's Defamation Claim Survives as a Matter of Law**

In her memoir, the Defendant writes about Nancy, "whom the school had kicked out midterm for bad behavior. She and Jackie had been found in a nearby town high on God-knows-what."

The incident in a nearby town never happened. However, a reader would reasonably draw the inference that it *did* happen, and that the bad behavior in question concerned the incident.

Court must examine the statement, "in its totality in the context in which it was uttered or published[,]… consider[ing] all the words used, not merely a particular phrase or sentence," *Myers v. Boston Magazine Co*., 403 N.E.2d 376, 379 (Mass. 1980).

The truth of the matter is that Jackie Guber received a three-day suspension, and Nancy Shay received a two-week suspension for an incident that occurred in Ms. Shay's dormitory

room. In that context—in the totality of what was written or not written, Nancy Shay is portrayed as a drug user kicked out for that reason.

"High on God-knows-what," is careless and open-ended with a host of possibilities—high on cocaine; high on LSD, or at least high-enough on something bad enough, that it led to Nancy Shay's expulsion. Certainly, this reasonable conclusion in a reader's mind would, "hold the plaintiff up to scorn, hatred, ridicule or contempt." *Amrak Prods., Inc v. Morton,* 410 F. 3d 69, 72 (1st Cir. 2005).

The statement *did* damage the Plaintiff's reputation in a, "considerable segment of the community. *Amra*k at 72.

"Words may be actionable even if they do not tend to damage the plaintiff's reputation or hold him up to ridicule in the community at large or among all reasonable people; it is enough to do so among a considerable and respectable class of people." *Smith v. Suburban Restaurants, Inc*., 374 Mass. 528, 530 (1978).

Certainly, the faculty and students at *Wykeham Rise* during Nancy Shay's days there, constituted a considerable and respectable class of people. And the friends Ms. Shay has now are considerable and respectable. This class knows well who the Nancy is in *Audition*.

The Defendant notes in its Memorandum that Plaintiff, "leaves undisputed nearly identical statements appearing just pages later." However, a careful reading of the statements on Page 383 of *Audition* reveal that those statements are attributable to Jackie Guber, not from the author's own imagination as is the made-up incident in the nearby town.

15

In that it's arguably true that Nancy Shay was expelled for bad behavior, the Defendant looks for evidence of malice. However, "…the truth or falsity of the statement is immaterial, and the libel action may proceed, if the plaintiff can show that the defendant acted with "actual malice" in publishing the statement." *Noonan v. Staples, Inc.*, 556 F.3d 28 (1st Cir. 2009citing *White v. Blue Cross & Blue Shield of Mass., Inc.*, 809 N.E.2d 1034, 1036 n.4 (Mass. 2004)(citing Mass. Gen. Laws Chapter 231, Section 92).

Courts in the Commonwealth define actual malice as, "ill will" or "malevolent intent." "[W]e conclude that Mass. Gen. Laws Ch. 231, § 92 means "common-law malice" when it uses the term, "actual malice." *Noonan.*

If a reader looks carefully at the statement made by Defendant on Page 381 of *Audition*, "in its totality in the context in which it was uttered or published[,]… consider[ing] all the words used, not merely a particular phrase or sentence,"  [*Myers* at 379], the reader will find ill will or malevolent intent. Perhaps both. The truth that Nancy was expelled for an incident in her dorm room involving Jackie Guber is overlooked by the author. Instead a made-up story about drugs in a nearby town is inserted maliciously in its place, leading the reader to believe the Plaintiff's *Wyckeham Rise* career was brought to a close because of bad behavior in the form of drugs.

In its memorandum, the Defendant takes great pains to point out that mention of a mere first-name, Nancy, could only be identifiable to a small class, if identifiable at all.

After this action was filed, a  newsman reported to Plaintiff's lawyer that in subsequent editions of *Audition*, the name *Nancy* had been changed to *Mary*. In a July 2011 email, and certified letter, Plaintiff's lawyer asked Sonny Mehta, Editor-in-Chief of *Knopf* about the change. Mr. Mehta turned the question over to a junior editor. Neither has answered the question. It

16

seems a considerable and respectable class at *Knopf* thinks the statements and reference to Nancy *are* actionable.

### Requisite Fault

Fault is a requisite to, "assure to the freedoms of speech and press that, 'breathing space' essential to their fruitful exercise." *Gertz v. Robert Welch, Inc.*, 418 US. 323, 342 (1974).

The Defendant is a newswoman and knows that reporting imaginary events is reserved for the fiction publications. One can't say she is without fault when she made up a story and sold it as real to the exclusion of the true story. A newswoman takes an oath if only in her mind-- akin to the oath one takes in court—to tell the truth, and the whole truth. She otherwise does a grave injustice to her readers.

This sentiment is echoed in the *Code of Ethics* published by the Society of Professional Journalists. "The duty of the journalist is to further those ends by seeking truth and providing a fair and comprehensive account of events and issues."

The conduct for which Nancy Shay was kicked out of *Wykeham Rise* was not, "bad behavior," at that institution. The Defendant knows the truth and the whole truth, and instead chose to write fiction while turning her back on what really happened. This certainly isn't *good will* in the context of *Noonan*.

### Plaintiff's Emotional Distress Claim is Neither Duplicative; nor Does It Fail.

Defendant takes great pains in her memorandum to point out the duplicative nature of Plaintiff's defamation and emotional distress claims. The principal difference between the two claims, however, is that for defamation, *Audition* would require readers. Whereas for the Plaintiff's emotional distress claim there would need be only one reader—Nancy Shay. In an emotional distress claim, the opinions of any respectable and considerable class wouldn't matter.

In the context of this action, Defendant cites *Albright* the way one might compare apples to oranges, holding that book publishers owed no duty to the plaintiff to accurately label the book's photograph when so doing did not constitute defamation, and stating that, "[w]ithout a viable defamation claim, it would be difficult to find that a reasonable person would have suffered emotional distress under the circumstances." *Albright v. Morton*, 321 F. Supp. 2d 130, 134, 141 (D. Mass. 2004).

However, here the Plaintiff isn't suing a book publisher, and *does* have a viable defamation claim. The Plaintiff in this action is suing a woman who unlike the book publisher knows the *true* story and didn't mistake Nancy's identity when she wrote about *Nancy*.

## Plaintiff Has Pled a Claim for Negligent Infliction of Emotional Distress

Defendant avers that Plaintiff must, *"prove,"* at least five elements to recover for negligent infliction of emotional distress. [Defendant Memorandum Page 19, Paragraph B.] However, proof can come later at trial by a preponderance of the evidence.

At the *pleading* stage, Plaintiff has in fact pled (1) the Defendant's negligence; (2) emotional distress; (3) causation; (4) objective corroboration by physical harm; and (5) that a reasonable person would have suffered emotional distress under the circumstances. *Payton v. Abbott Labs*, 437 N.E. 2d 171, 181 (Mass.1982).

Depression, alcoholism, and agoraphobia are factual conditions. Examples of the attendant distress aren't needed for even a lay person's understanding of these conditions. A depressed alcoholic is habitually unhappy. In her pleadings, the Plaintiff identifies negligence on the part of the Defendant as the cause in fact of her suffering—that the Defendant had a duty to tell the whole truth and not invent damaging stories.

Additionally, to ascribe alcoholism, depression and agoraphobia to the Plaintiff *is* to allege physical harm sufficient to provide, "objective corroboration of the emotional distress alleged." *Payton* at 181.

In short, the Defendant is clenching at straws to send the Plaintiff and her claims away, to the exclusion of the merits. The First Amendment doesn't protect journalists when they invent stories that injure people, while turning their backs on the truth they know all to well.

The *Society of Professional Journalists* has codified this principle, and urges its members:"Test the accuracy of information from all sources and exercise care to avoid inadvertent error. Deliberate distortion is never permissible." And in a section of its rules titled, "Minimizing Harm," the *Society* writes, "Recognize that private people have a greater right to control information about themselves than do public officials and others who seek power, influence or attention. Only an overriding public need can justify intrusion into anyone's privacy."

In the context of this action, regarding what the Defendant wrote about Nancy Shay, it seems the journalist's code of ethics was forgotten.

**CONCLUSION**

WHEREFORE, Plaintiff respectfully requests that this Court sustain the complaint against Defendant Barbara Walters.


By: /s/ Mark Ellis O'Brien


Mark Ellis O'Brien

17D Fernwood Drive
Leominster, MA 01453
Phone: 978.413.6757.   FAX: 978.728.4991.
justice457@gmail.com

*Attorney for Nancy Shay*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 21 July 2011, a true copy of the above document was filed

through the EFC system and will be sent electronically to the registered participants identified on

the Notice of Electronic Filing.

<u>/s/ Mark Ellis O'Brien</u>